MOBIL PRODUCING TEXAS & NEW MEXICO, INC. Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION Respondent.

No. 88–4035.

United States Court of Appeals, Fifth Circuit.

Oct. 6, 1989.

Dwight Cooper Alpern, Jerome Feit, Sol., Federal Energy Regulatory Com'n, John N. Estes, III, Washington, D.C., for FERC.

E.R. Island, Douglas Kent Porter, Los Angeles, Cal., for Southern California Gas Co.

Charles E. Suffling, John K. McDonald, Washington, D.C., for Pennzoil Co.

Charles A. Moore, Cheryl M. Foley, Houston, Tex., for Transwestern Pipeline Co.

Timothy J. Jacquet, C. Roger Hoffman, Houston, Tex., for Exxon Corp.

Jon L. Brunenkant, Washington, D.C., for Amoco Production Co.

Gregory Grady, Douglas O. Waikart, Washington, D.C., for Williams Natural Gas Co.

Michael B. Day, J. Calvin Simpson, Janice E. Kerr, San Francisco, Cal., for the Public Utilities Com'n of the State of Cal.

Richard C. Green, Washington, D.C., Richard O. Baish, El Paso, Tex., for El Paso Natural Gas Company.

Thomas G. Wagner, Jay G. Martin, Mobil Producing Texas & New Mexico, Inc., Gordon Gooch, Mark R. Haskell, Houston, Tex., Katherine B. Edwards, Thomas G. Wagner, Washington, D.C., for Mobil Producing Texas & New Mexico, Inc.

Before CLARK, Chief Judge, BROWN and JOHNSON, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

### What's It All About?

Mobil Producing Texas & New Mexico (Mobil) is before this Court primarily to argue the issue of 100% Load Factor rates and open access under Order No. 436 [1] of the Federal Energy Regulatory Commission (FERC). Mobil raises, in addition, the lack of standby charges for Transwestern Pipeline Company (Transwestern) customers who switch from Firm Sales service to Firm Transportation service, and the lack of separate volume projections and allocated costs for Firm and Interruptible Transportation services.

On review of FERC's decision below,[2] we affirm.

### The Facts

Transwestern is engaged in the transportation of natural gas and operates an interstate pipeline system. The Transwestern pipeline begins in Texas and branches, in New Mexico, into two pipelines, one running west to the California/Arizona border, and the other northeast to the Kansas/Oklahoma border. Transwestern's pri-

---

**1.** Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol, Order No. 436, 50 Fed. Reg. 42,408 (1985), FERC Statutes and Regulations, Regulations Preambles 1982–1985 ¶ 30,665; *reh'g granted in part and denied in part,* Order No. 436–A, 50 Fed.Reg. 52,217 (1985), FERC Statutes and Regulations, Regulations Preambles 1982–1985 ¶ 30,675; *reh'g granted in part,* Order No. 436–B, 51 Fed.Reg. 6,398 (1986), FERC Statutes and Regulations ¶ 30,688; *reh'g denied,* Order No. 436–C, 51 Fed. Reg. 11,566 (1986), 34 FERC ¶ 61,404; *reh'g denied,* Order No. 436–D, 51 Fed.Reg. 11,569 (1986), 34 FERC ¶ 61,405; *reconsideration denied,* Order No. 436–E, 51 Fed.Reg. 1,156 (1986), 34 FERC ¶ 61,403; *reversed in part and remanded, Associated Gas Distributors v. FERC,* 824 F.2d 981 (D.C.Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1469, 99 L.Ed.2d 698 (1988); *on remand,* Order No. 500, 52 Fed.Reg. 30,334 (1987), FERC Statutes and Regulations ¶ 30,761; *modified,* Order No. 500–A, 52 Fed.Reg. 39,507 (1987), FERC Statutes and Regulations ¶ 30,770; *modified,* Order No. 500–B, 52 Fed.Reg. 39,630 (1987), FERC Statutes and Regulations ¶ 30,772; *modified further,* Order No. 500–C, 52 Fed.Reg. 48,986 (1987), FERC Statutes and Regulations ¶ 30, 786; *modified further,* Order No. 500–D, 53 Fed.Reg. 7,893 (1988), FERC Statutes and Regulations ¶ 30,800; *reh'g denied,* Order No. 500–E, 53 Fed.Reg. 16,859 (1988), 43 FERC ¶ 61,234; *modified further,* Order No. 500–F, 53 Fed.Reg. 50,924 (1988), FERC Statutes and Regulations ¶ 30,841; *reh'g denied,* Order No. 500–G, 46 FERC ¶ 61,148 (1989).

**2.** *Transwestern Pipeline Co.,* 38 FERC ¶ 61,061 (1987), *reh'g denied,* 41 FERC ¶ 61,178 (1987).

mary customers are Southern California Gas Company (SoCal), which uses the pipeline running to the California/Arizona border and Williams Natural Gas Company (Williams), which uses the pipeline running to the Kansas/Oklahoma border.[3]

Transwestern filed for a rate change with FERC on July 30, 1985. FERC subsequently issued Order No. 436 on October 9, 1985. To bring itself into the compliance with the new regulatory structure, Transwestern filed an offer of settlement on January 16, 1986 which established, for both sales and transportation rates, the cost of service, projected volumes, and rate design. The settlement also set specific rates, terms and conditions for Firm and Interruptible transportation performed under Order No. 436. On February 14, 1986, FERC agreed to allow Transwestern to put into effect the settlement on a temporary basis pending approval of the settlement.[4] The settlement was subsequently approved by FERC on January 28, 1987, to run for three years from February 1, 1986,[5] and rehearing was denied November 17, 1987.[6] This appeal results.

### 100% Load Factor Rates

█ Regarding the issue of 100% Load Factor rates, Mobil argues that: (i) Interruptible Shippers are being charged for a service they do not receive under the 100% Load Factor methodology, that is, guaranteed access to the pipeline system; (ii) the 100% Load Factor rate violates Order No. 436 in that the rate does not reflect the quality of the service; (iii) the 100% Load Factor rate is an unjustified departure from precedent; and (iv) the 100% Load Factor rate is anticompetitive.

First, regarding 100% Load Factor rates and Order No. 436, we agree with the recent decision of the Eighth Circuit, *Mobil Oil Corp., et al. v. FERC,*[7] and its discussion of these issues. We thus hold for FERC on subissues (i) and (ii) above.

In addition to the Eighth Circuit's treatment, we emphasize that, in effect, the petitioners insist that because the Interruptible Transportation rate comprises the D–1 and D–2 and the Commodity Charges, Interruptible Shippers are having to pay for a service they do not receive—reserved transportation capacity. But, as urged by FERC, this confuses what a Firm Shipper must pay for Firm Transportation, on the one hand, and what is the *cost* of the service supplied to the Interruptible Shipper. This is demonstrated by considering the consequences if the Interruptible Shippers, as urged by Mobil, had only to pay a volumetric charge for gas actually transported based on the Commodity Charge. That result would mean the Interruptible Shipper would pay only those costs within the scope of the Commodity Charge, and none of the fixed charges within the scope of, say, D–1 and D–2, although the fixed costs represented by D–1 and D–2 would be incurred in supplying the service.[8] The

3. Williams is in the process of terminating its contracts with Transwestern, which will leave SoCal as Transwestern's only Firm Sales or Firm Transportation customer.

4. *Transwestern Pipeline Co.,* 34 FERC ¶ 61,202 at 61,338 (1986).

5. *Transwestern Pipeline Co.,* 38 FERC ¶ 61,061 (1987).

6. *Transwestern Pipeline Co.,* 41 FERC ¶ 61,178 (1987).

7. *Mobil Oil Corp., et al. v. FERC,* 886 F.2d 1023 (8th Cir.1989) (1989).

8. This has been well described by FERC as follows:
   If the fixed costs [Transwestern] has incurred to provide interruptible service include return on equity and related income taxes, then they must also include depreciation costs, for return on equity is a return on capital invested in transmission related facilities while depreciation is the return of that same capital. The fixed costs must also include labor costs, for [Transwestern] must operate and maintain the transmission related facilities upon which it earns a return. The fixed costs must also include debt costs, for transmission facilities are not financed simply through equity. And the fixed costs must include other taxes, for [Transwestern] must pay property taxes on the facilities upon which it earns a return * * * Accordingly, we hold that, pursuant to section 284.7(d)(4) [requiring rates under Order No. 436 to be based on 'properly allocated costs'], it is reasonable for a pipeline to fully allocate all of its transmission related fixed costs * * * to interruptible transportation.
   *Texas Eastern Transmission Corp.,* 37 FERC ¶ 61,260 at 61,703.

pipeline would not recover its full fixed costs. To the extent the Interruptible Shipper received free transportation, it will be subsidized by the Firm Shippers.

Regarding subissue (iii), we do not agree that this is an unjustified departure from FERC precedent.[9] To be sure, traditionally FERC's "long standing practice" required the Interruptible Customer "to pay a rate equal to the Commodity Charge for Firm Service."[10] But this was in the pre–436 days in which pipelines were primarily natural gas merchants, not transporters of other people's natural gas.

FERC has broad discretion in structuring its proceedings and although FERC may grant the opportunity for a hearing on an issue in another case, this does not mandate that FERC must so grant a hearing in the instant case. As the Eighth Circuit held in its *Mobil* decision,[11] Order No. 436 and 100% Load Factor rates were novel approaches when FERC rendered its decision in these cases and consequently a hearing would not have developed substantial evidence that would aid FERC in evaluating the new regulatory scheme. When *Southern Natural* was handed down, however, FERC had gained some experience in this new regulatory structure and thus a hearing might benefit it in evaluating the 100% Load Factor rates. Although this experience has been gained at the expense of parties to the initial rate schedules incorporating 100% Load Factor rates, in a wider sense it has benefitted FERC and the industry and thus is acceptable.

Again adopting the approach of the Eighth Circuit's *Mobil Oil* case, we empha-size that this is a new regulatory experiment for FERC and that FERC has legitimate policy reasons for embarking on such a dramatic restructuring of the natural gas transportation industry. Being new, with no actual experience to afford a basis for the determination or pronouncement of workable guidelines, the Commission is entitled to pursue a process of experimentation. Indeed, the three-year period for these rates attest to FERC's need for experience in actual practice.

Finally, regarding subissue (iv), we likewise uphold FERC.[12] We do not agree that the use of the 100% load factor is unduly anticompetitive.[13] FERC argues that Transwestern's pricing capabilities are not monolithic and the fact that it has regularly offered discounts on its services to Interruptible Shippers is sufficient to show that the rates are not anticompetitive. Furthermore, it is an accepted principle that, although it is to be promoted, competition is only one factor to be weighed "along with other important public interest considerations."[14] Transwestern's 100% Load Factor rate does not shield its own natural gas from competition, as seen in the fact that Transwestern regularly feels the need to discount its services to promote use. FERC, thus, could infer that competition does in fact occur between Transwestern's own natural gas and natural gas transported for third parties. Given that competition is just one of several factors that FERC ought to consider in approving rate structures, FERC's reliance on Transwestern's regular discounting of its services is sufficient to satisfy competitive concerns.

---

**9.** In *Southern Natural Gas Co.,* 41 FERC ¶ 61,218 (1987), *reh'g granted in part,* 42 FERC ¶ 61,261 (1988), FERC handed down a decision also dealing with 100% Load Factor rates and in which it determined that a hearing was appropriate for a number of issues, both factual and legal. Although FERC upheld the use of 100% Load Factor rates in that case, it nonetheless allowed the issue to be raised again on rehearing. Mobil contends that the denial of a hearing in the case below is inconsistent with the granting of a hearing in *Southern Natural.*

**10.** *See Texas Eastern Transmission Corp.,* 37 FERC, ¶ 61,260 at 61,702.

**11.** *Mobil Oil,* 886 F.2d 1023, 1033–34 (8th Cir. 1989) (M/S 24).

**12.** The anticompetitive question is addressed primarily by intervenor Exxon, but the issue is raised by Mobil as well.

**13.** FERC raises, as a preliminary matter, the question of whether or not Mobil and intervenor Exxon even have standing to raise this issue. As we are finding for FERC on this point regardless, we shall assume that the appeal on this particular subissue is appropriate.

**14.** *Northern Natural Gas Co. v. FPC,* 399 F.2d 953, 961 (D.C.Cir.1968).

### Standby Charges

■ Under Transwestern's tariff schedule, sales customers are allowed to switch, without charge, between buying natural gas from Transwestern and buying natural gas from others and using Transwestern as a transporter. FERC originally ordered Transwestern to adopt a standby charge for this service,[15] but reversed its decision after rehearing, finding that such a charge would allow Transwestern double recovery of certain costs.[16]

Mobil argues on appeal that FERC's decision to allow Transwestern to abandon the standby charge was not based on record evidence and that essentially Interruptible Shippers are subsidizing standby service.

We do not agree. The standby charge was originally ordered to recover costs for production and gathering of natural gas. The record does show, however, that Transwestern has no production or gathering facilities and therefore these costs are not associated with Transwestern's sales service. To order the imposition of standby charges would therefore only allow Transwestern to recover costs that are not actually incurred in its service.

### Volume Projections and Cost Allocation

■ The final point raised by Mobil is that an evidentiary hearing is required to determine the allocation of costs between Firm and Interruptible transportation.

In order to properly allocate costs between the various services offered, pipelines generally submit projected throughput volumes for the various classes of services. In the instant case, Transwestern submitted a combined throughput volume figure to FERC.[17] FERC determined that this combined figure would suffice as there was sufficient, uncontested evidence to show that the breakdowns properly allocated costs.[18] Transwestern has only one Firm transportation customer, SoCal, and SoCal's contract entitlements are equal to the total capacity of Transwestern's California pipeline. Consequently, Transwestern's Firm service projections are readily determined by reference to SoCal's projections, which are of record.

Normally, FERC is required to base its decisions on record evidence, if FERC already has record access to the necessary evidence, a formal evidentiary hearing process is not necessary. Such hearings are not a right enjoyed by parties to a rate case, rather they are a tool to be used to help develop record evidence.[19] If such record evidence data already exists, neither the Commission, nor the parties nor the public need incur duplicative and wasteful steps. FERC has not erred in not holding such hearings in the instant case.

The decision of FERC is therefore affirmed.

AFFIRMED.

---

**15.** *Transwestern Pipeline Co.,* 38 FERC ¶ 61,061.

**16.** *Transwestern Pipeline Co.,* 41 FERC ¶ 61,178. FERC reversed the original decision that a standby charge should be included in the tariff schedule on the basis that the costs recovered in the standby charge were already included in the sales rate and therefore no separate charge was necessary.

**17.** Transwestern's combined transportation figure was 83,529,270 dekatherms (dth).

**18.** *Transwestern Pipeline Co.,* 41 FERC ¶ 61,178 at 61,449.

**19.** *Cerro Wire & Cable v. FERC,* 677 F.2d 124, 128 (D.C.Cir.1982) (Court held that FERC did not abuse its discretion in holding an informal conference rather than an evidentiary hearing.).