**TEXACO, INC., et al., Petitioners,**

**v.**

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 87–4735.

United States Court of Appeals, Fifth Circuit.

Oct. 6, 1989.

---

Jerome F. Feit, Sol., John H. Conway, Dwight Cooper Alpern, F.E.R.C., Washington, D.C., for F.E.R.C.

Lindsey How–Downing, San Francisco, Cal., for Pacific Gas & Elec. Co.

John T. Miller, Jr., Washington, D.C., for Elizabethtown Gas Co.

Thomas George Wagner, Jay G. Martin, Houston, Tex., for Mobil Oil Corp.

Judy M. Johnson, Houston, Tex., for Tex. Eastern Transmission Corp.

James R. Lacey, Newark, N.J., for Public Service Elec. and Gas Co.

Harvey L. Reiter, William I. Harkaway, Washington, D.C., Barbara M. Gunther, New York City, for Consolidated Edison Co. of New York, Inc.

Robert A. MacDonnell, Philadelphia, Pa., for Philadelphia Elec. Co.

John S. Schmid, Barbara K. Heffernan, Demetrios G. Pulas, Jr., Washington, D.C., for Bay State Gas Co., et al.

Stanley W. Balis, Washington, D.C., for The Municipal Defense Group.

David L. Konick, Washington, D.C., for The Brooklyn Union Gas Co.

Joseph M. Oliver, Jr., M. Lisanne Crowley, Washington, D.C., for N.J. Natural Gas Co.

William H. Penniman, John D. Sharer, Mary Katherine P. Yarbrough, Washington, D.C., for The Process Gas Consumers Group.

Jerome C. Muys, Washington, D.C., for Somerset Gas Service.

Joseph C. Bell, Jeffrey T. Sprung, Washington, D.C., for Citizens Energy Corp.

John E. Holtzinger, Jr., Keving J. Lipson, Washington, D.C., for Consolidated Gas Transmission Corp.

Kevin M. Sweeney, Washington, D.C., for Marathon Oil Co.

Stephen J. Small, Ronald N. Carroll, Charleston, W.V., for Columbia Gas Transmission Corp.

Richard A. Solomon, David D'Alessandro, Washington, D.C., for The Public Service Com'n of the State of N.Y.

James F. Bowe, Jr., Washington, D.C., for Long Islandlightning Co.

John F. Harrington, Kenneth R. Carretta, Washington, D.C., for Texas Gas Transmission Corp.

Robert W. Maris, Richard E. Stabinski, John K. McDonald, Philadelphia, Pa., for Philadelphia Gas Works.

Charles E. Suffling, Washington, D.C., for Penzoil Co.

Judy M. Johnson, Houston, Tex., for Texas Eastern Trans. Corp.

James D. Hurley, Texaco, Inc., Legal Dept., New Orleans, La., Gordon Gooch, Katherine B. Edwards, Mark R. Haskell, Travis & Gooch, Washington, D.C., Ralph J. Pearson, Jr., David Lindberg, Texaco Inc., Legal Dept., Houston, Tex., Thomas J. Eastment, Washington, D.C., C. Roger Hoffman, Exxon Corp., Houston, Tex., for Exxon Corp.

Before CLARK, Chief Judge, BROWN and JOHNSON, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

*FERC Makes for Strange Bedfellows*

Texaco Inc. (Texaco), et al[1] appeals the decision[2] of the Federal Energy Regulatory Commission (FERC) accepting a settlement proposed by Texas Eastern Transmission Corp. (Texas Eastern),[3] which resolved Texas Eastern's 1985 general rate case and put into effect open access pursuant to FERC Order No. 436.[4]

Texaco challenges (i) the allowing of Texas Eastern to use the 100% Load Factor rate[5] in fixing the Interruptible Transportation rate,[6] and (ii) FERC's determining

---

**1.** Petitioners are natural gas producers Texaco and Exxon Corporation (Exxon), natural gas distributor Consolidated Edison Company of New York, Inc. (ConEd) and Process Gas Consumers Group (PGC) an association which represents industrial end users.

**2.** *Texas Eastern Transmission Corp.,* 35 FERC ¶ 61,416 (1986), 37 FERC ¶ 61,260 (1986), *reh'g granted in part,* 41 FERC ¶ 61,015 (1987).

**3.** Texas Eastern is a pipeline company engaged in the sale and transportation of natural gas.

**4.** Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol, Order No. 436, 50 Fed. Reg. 42,408 (1985), FERC Statutes and Regulations, Regulations Preambles 1982–1985 ¶ 30,665; *reh'g granted in part and denied in part,* Order No. 436–A, 50 Fed.Reg. 52,217 (1985), FERC Statutes and Regulations, Regulations Preambles 1982–1985 ¶ 30,675; *reh'g granted in part,* Order No. 436–B, 51 Fed.Reg. 6,398 (1986), FERC Statutes and Regulations ¶ 30,688; *reh'g denied,* Order No. 436–C, 51 Fed. Reg. 11,566 (1986), 34 FERC ¶ 61,404; *reh'g denied,* Order No. 436–D, 51 Fed.Reg. 11,569 (1986), 34 FERC ¶ 61,405; reconsideration denied, Order No. 436–E, 51 Fed.Reg. 1,156 (1986), 34 FERC ¶ 61,403; *reversed in part and remand-* ed, *Associated Gas Distributors v. FERC,* 824 F.2d 981 (D.C.Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 1468, 99 L.Ed.2d 698 (1988); *on remand,* Order No. 500, 52 Fed.Reg. 30,334 (1987), FERC Statutes and Regulations ¶ 30,761; *modified,* Order No. 500–A, 52 Fed.Reg. 39,507 (1987), FERC Statutes and Regulations ¶ 30,770; *modified,* Order No. 500–B, 52 Fed.Reg. 39,630 (1987), FERC Statutes and Regulations ¶ 30,772; *modified further,* Order No. 500–C, 52 Fed.Reg. 48,986 (1987), FERC Statutes and Regulations ¶ 30,786; *modified further,* Order No. 500–D, 53 Fed.Reg. 7,893 (1988), FERC Statutes and Regulations ¶ 30,800; *reh'g denied,* Order No. 500–E, 53 Fed.Reg. 16,859 (1988), 43 FERC ¶ 61,234; *modified further,* Order No. 500–F, 53 Fed.Reg. 50,924 (1988), FERC Statutes and Regulations ¶ 30,841; *reh'g denied,* Order No. 500–G, 46 FERC ¶ 61,148 (1989).

**5.** The 100% Load Factor rate is generally described as the rate equal to the total per-unit charges that would be paid for Firm transportation if the Firm shipper consistently transported 100% of the amount of the capacity that it reserved.

**6.** Texaco is joined by ConEd and PGC on this issue.

that the cost of service is properly allocated between the types of services offered by Texas Eastern. Exxon challenges FERC's decision to not require Texas Eastern to charge seasonally differentiated Interruptible Transportation rates. In addition to its arguments regarding the 100% Load Factor rate, PGC raises the issue of the assessment of penalties for monthly imbalances between amounts scheduled for delivery, amounts delivered and amounts actually taken for use.

On review of the various appeals, we affirm the decision of FERC below.

### The Facts of the Matter

Texas Eastern submitted to FERC proposed settlement rates for an interim Interruptible Transportation rate (TS-3 rate)[7] and for a permanent Interruptible Transportation rate (IT-1 rate) and Firm Transportation rate (FT-1 rate). The IT-1 was equal to the TS-3 rate and both the IT-1 and FT-1 rates included provisions for penalties.

In the Order Approving the Contested Offer of Settlement,[8] FERC approved the settlement, including the FT-1 rate and the use of 100% Load Factor rates for Interruptible Transportation rates. FERC also approved the lack of seasonal rates and deferred consideration of seasonal rates proposed by the petitioners. Regarding the question of penalties, FERC did not approve Texas Eastern's proposed penal-

ties but did adopt modified penalties to be used on an interim basis, subject to refund and pending a hearing.

Applications for rehearing were filed by various parties. FERC stood by its decisions regarding the use of 100% Load Factor rates and seasonal rates and decided to approve the modified penalties it ordered when it accepted the Settlement without the hearing that had also been ordered. Texas Eastern subsequently rejected the FT-1 and IT-1 rates, including the penalties associated with those rates, as approved by FERC. Consequently, the FT-1 and IT-1 rates, and their associated penalties, have not been put into effect.[9]

### Load Factor Rates

■ The issue of the 100% Load Factor rate basis and open access transportation under Order No. 436 has recently been dealt with by the Eighth Circuit[10] and we herein adopt their conclusion that FERC has not erred in allowing the use of the 100% Load Factor rate as the basis for Interruptible Transportation rates.[11] Thus, we hold that FERC has not abused its discretion in allowing the use of the 100% Load Factor rate and that the 100% Load Factor rate adequately reflects the relative reliability of Interruptible service.[12]

The argument that 100% Load Factor rates are anticompetitive is based on the contention that Texas Eastern's sales cus-

---

**7.** The TS-3 rate was authorized only for the "locked in" period of September 1, 1985 to December 31, 1987.

**8.** *Texas Eastern Transmission Corp.,* 37 FERC ¶ 61,260.

**9.** However, interruptible transportation can still be offered by Texas Eastern using the TS-3 rate schedule.

**10.** *Mobil Oil Corp., Et Al. v. FERC,* 886 F.2d 1023, 1030 (8th Cir.1989) (1989).

**11.** In addition to the Eighth Circuit's treatment we further hold that, although the petitioners insist that regarding Interruptible Transportation service they are having to pay for a service they do not receive—reserved transportation capacity—nonetheless, if Interruptible Shippers had only to pay a volumetric charge for natural

gas actually transported based on the Commodity Charge portion of the Firm Transportation rate schedule, the result would mean the Interruptible Shipper would pay only those costs within the scope of the Commodity Charge. None of the fixed costs within the scope of the Demand or Reservation portion of the Firm Transportation rate schedule would be recovered even though the fixed costs represented by the Demand portion would be incurred in supplying the Interruptible Transportation service. The pipeline, thus, would not recover the full measure of fixed costs incurred in providing Interruptible Transportation service if only the Commodity Charge portion were used as the basis for the Interruptible Transportation rate. *See also Texas Eastern Transmission Corp.,* 37 FERC ¶ 61,260 at 61,703.

**12.** *See also, Mobil Producing Texas & New Mexico v. FERC,* 886 F.2d 745, 748 (5th Cir.1989).

tomers will continue to buy Texas Eastern's own natural gas because they must continue to pay Texas Eastern the sales demand charge [13] under their sales contracts in addition to paying the cost of third party natural gas transported by Texas Eastern. In effect, there is a bias for Texas Eastern's own natural gas because it will always be cheaper for sales customers to buy from Texas Eastern rather than pay Texas Eastern the sales demand charge and then buy natural gas from third party shippers who have also paid Texas Eastern a demand charge.

Although competitive rates are a goal to be considered when approving rates, FERC is not bound by such considerations, rather, it must weigh them "along with other important public interest considerations." [14] FERC has determined that the greater interest is that Interruptible Transportation rates should recoup all the costs associated with providing the service and that to approve Interruptible Transportation rates based on the commodity charge alone would be a greater evil by allowing Interruptible shippers to avoid payment of costs associated with providing them with transportation. Regarding the anticompetitive claim raised below, we therefore also hold that FERC did not err in its decision to use the 100% Load Factor rate as the basis for the Interruptible Transportation rate.

### Allocation of Costs

In addition to the arguments raised above regarding the 100% Load Factor rate, Texaco also complains that the Interruptible Transportation rate does not properly recover the costs of service. Specifically, Texaco objects because the Firm Transportation rate was determined by allocating fixed costs to two demand categories, D–1 and D–2 while the Interruptible Transportation rate utilized only one demand charge, D–1. Thus, the Firm Transportation rate comprised (D–1 + D–2) + Commodity Charge while the Interruptible Transportation rate was structured as D–1 + Commodity Charge.

This is really just another version of Texaco's attack on the 100% Load Factor rates. Texaco argues that Demand costs should be excluded from Interruptible Transportation rates leaving the Commodity Charge as the basis for Interruptible Transportation rates. We reject this argument because Interruptible shippers should bear the same burden of fixed costs that Firm shippers bear as both classes of shippers benefit from the same service, transportation between two points. Provided the 100% Load Factor rate is used to determine the Interruptible Transportation rate, it is irrelevant whether or not the Interruptible Transportation rate has one or two categories of demand charges. In practice, all the fixed costs associated with transportation will be recovered regardless.

Moreover, FERC was not indifferent to this problem. FERC required Texas Eastern to file work papers showing the breakdown of its costs and projected volumes, and FERC considered those breakdowns and projected volumes when it determined that any error in the structuring of the Interruptible Transportation rate was harmless.

We agree with FERC that any error in structuring the Demand portion of the Interruptible Transportation rate was harmless given the fact that the Interruptible Transportation rate is equivalent to the 100% Load Factor rate.

### Seasonal Rates

FERC refused to require Texas Eastern to include seasonal rates in its current rate schedule and deferred consideration of seasonal rates based on a modified version of the marginal cost theory until Texas Eastern's next round of rate hearings. Exxon appealed complaining that Texas Eastern is

**13.** The methodology of creating rate structures generally used by FERC divides the rate into two types of charges, the demand charge which recovers fixed costs associated with operating and maintaining a pipeline and the commodity charge which recovers costs associated with the natural gas transported. The demand charge plus the commodity charge equals the total cost of service.

**14.** *Northern Natural Gas Co. v. FPC,* 399 F.2d 953, 961 (D.C.Cir.1968).

required to include seasonal rates in its rate schedule.

■ Under its regulations, FERC is not required to order seasonal rates. Section 284.7 [15] merely outlines considerations that FERC should take into account in approving rate schedules. Despite Exxon's contention that seasonal rates are required under § 284.7, we agree with FERC that seasonal rates are goals that ought to be considered when approving rate schedules but which are not absolutely required to be included in such schedules.

■ FERC also argues that in the instant case, the seasonal rates sought by the petitioners are marginal cost rates.[16] FERC's traditional approach has been to reject the marginal cost theory in favor of an average cost of transporting a unit of natural gas during a given period. Moreover, the marginal cost rate proposed by Exxon is not a pure marginal cost rate but does in fact include some of the fixed costs of operating and maintaining the pipeline. Given FERC's broad discretion in organizing its caseload, it has not acted unreasonably in deferring consideration of this issue until Texas Eastern's next rate case. At that time, it will be possible to evaluate seasonal rates and the modified marginal cost theory proposed by Exxon in light of how Texas Eastern has actually operated under open access. We therefore hold for FERC on this issue.

### Penalties

The issue of penalties in this case stems from the rate schedules for Interruptible (IT–1) and Firm (FT–1) Transportation. Under those schedules, Texas Eastern was allowed to impose penalties on shippers who (i) delivered more natural gas to Texas

Eastern for shipment than they were scheduled to deliver, or (ii) delivered more or less natural gas for transportation than they then took upon delivery from Texas Eastern. The FT–1 and IT–1 rate schedules, however, have not been implemented as FERC deemed them to have been rejected by Texas Eastern. Penalties, thus, are not being imposed on Texas Eastern shippers under these rate schedules.

PGC nonetheless urges this Court to review the penalties. PGC contends that these penalties are improper because they are non-cost based penalties and that the decision by FERC to use such penalties has become a consistently applied generic policy.[17] Essentially, PGC complains that FERC has a "crystallized" policy of approving such penalties, the penalties are improper, and thus, the issue is not purely conjectural.

■ Despite the urgent plea that we add to the already overwhelming volume of academic, legalistic literature on the regulation of the sale and transportation of natural gas, we do not reach the correctness of the issue for the very simple reason that it is not in the case before us. No one is aggrieved by penalties by any order in this case. FERC ruled that Texas Eastern did not accept the FT–1 and IT–1 rates and consequently Texas Eastern cannot impose the penalties those rate schedules authorized. That it might be a burning issue to the industry and citation by FERC of its onetime decision in the case below constitutes a damning precedent which ought to be extinguished, affords us no power under either § 19 of the Natural Gas Act or the constraints of Article III to engage in speculation on what some court, someday might hold.[18]

---

**15.** 18 C.F.R. § 284.7 (1988).

**16.** The marginal cost theory holds that the transportation of each additional unit of natural gas is priced to equal the additional cost of transporting the unit at that time. Thus, at peak times, additional capacity can only be gained by adding to the physical transportation facilities, creating a high marginal cost, whereas in off-peak periods when unused capacity exists, the marginal costs are low because no additional facilities need to be added.

**17.** PGC cites nine other cases in which it claims that similar penalties have been authorized. Moreover, in those cases, FERC cited the Texas Eastern opinions below as precedent for authorizing the penalties.

**18.** The issue is, or might be, or might become involved in, the pending case of *Texas Eastern Transmission Corp.*, FERC Docket No. RP88–81–000 (1988).

*The End Result*

For the reasons stated above, we find no merit in the appeals of the various petitioners and therefore hold for FERC.

AFFIRMED.