## OZARK GAS TRANSMISSION SYSTEM, Petitioner,

v.

## FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

### Nos. 87–1751, 88–1411.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 29, 1989.

Decided Feb. 27, 1990.

---

Karol Lyn Newman, with whom Brian R. Gish and Steven J. Ross, Washington, D.C., were on the brief, for petitioner.

Joel M. Cockrell, with whom David N. Cook, Acting Gen. Counsel, and Jerome M. Feit, Sol., Washington, D.C., were on the brief, for respondent.

Before MIKVA, RUTH BADER GINSBURG, and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

In 1985, the Federal Energy Regulatory Commission ("FERC") began efforts to increase competition among natural gas pipelines by permitting pipeline companies to carry natural gas on an "open-access, self-implementing" basis. Petitioner, Ozark Gas Transmission System ("Ozark"), sought an open-access blanket certificate for its interstate natural gas pipeline. Because of peculiarities in its financing arrangement and original certificate, Ozark would violate the terms of its loan agreement if it strictly complied with FERC's open-access regulations. FERC granted Ozark a waiver from the conflicting provisions but attached conditions to Ozark's blanket certificate which would have required the pipeline to charge more than twice as much as its only competitor and which would not have eliminated the conflict with Ozark's debt instruments. In light of the purposes of the waiver and FERC's "open-access" objectives, we find that FERC did not engage in reasoned decisionmaking in formulating the conditions attached to Ozark's blanket certificate. Accordingly, we remand.

## I. BACKGROUND

In 1981, Ozark received a certificate from FERC under Section 7(e) of the Natural Gas Act ("NGA"), 15 U.S.C. § 717f(e) (1982), authorizing it to construct and operate a natural gas pipeline in the Arkoma basin, which extends from Arkansas to Oklahoma. *Ozark Gas Transmission System,* 16 FERC ¶ 61,099, *reh'g denied,* 17 FERC ¶ 61,024 (1981). The Ozark pipeline was originally designed to transport gas on a regular or "firm" basis for two pipeline companies, Tennessee Gas Pipeline ("Tennessee") and Columbia Gas Transmission Corporation ("Columbia"). Both Columbia and Tennessee are partners in Ozark, and each contracted for half of Ozark's pipeline capacity, although neither company uses— or expects to use—its full allotment.

In order to construct and operate its pipeline, Ozark proposed to obtain loans through "project-financing," a method which has been expressly approved by FERC. Under project-financing, Ozark's lenders agreed to secure their loans with the anticipated stream of income from the constructed pipeline. The lenders, however, demanded that Ozark guarantee its income stream regardless of the project's ultimate success. To accomplish this, Ozark proposed that a two-tiered rate system be incorporated into its Section 7(e) certificate. The first part of the rate (the "demand charge" or "minimum bill") covered all of Ozark's fixed costs (i.e., operating and maintenance expenses, taxes, amortized debt principal, and debt interest). These demand charges were guaranteed by Columbia and Tennessee regardless of whether any gas was shipped. The second part of the rate (the "commodity charge") included all other rate components, includ-

ing return on equity, depreciation of equity, and income taxes. The Commission granted Ozark's request with certain limitations not relevant here. *Id.* 16 FERC ¶ 16,099 (1981).

Following the pipeline's construction, Ozark provided "firm" transportation service to Columbia and Tennessee and "interruptible" service to other shippers. The firm shippers retained first priority access to all of the pipeline's capacity. When Ozark's firm shippers required less than the pipeline's full capacity, Ozark attempted to sell the unused space to interruptible shippers under Section 311 of the Natural Gas Policy Act ("NGPA"). 15 U.S.C. § 3371 (1982) ("Section 311"). The firm shippers continued to pay 100 percent of Ozark's fixed costs, and thus the interruptible shippers paid only the commodity rate.

In 1985, the Commission undertook a broad restructuring of the natural gas transportation industry to promote competition in gas markets. Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol, Order No. 436, 50 Fed.Reg. 42,-408 (1985) ("Order No. 436"); *see Associated Gas Distrib's v. FERC,* 824 F.2d 981, 993 (D.C.Cir.1987), *cert. denied sub. nom. Southern California Gas Co. v. FERC,* 485 U.S. 1006, 108 S.Ct. 1469, 99 L.Ed.2d 698 (1988). Order No. 436 permitted interstate pipelines to obtain a blanket certificate to transport natural gas without having to secure individual certification for each transaction. This new approach allows distributors and consumers to purchase gas from sellers other than pipelines and to have it transported by the pipelines in competition with the pipelines' own sales of gas. *Mobil Oil Corp., et al. v. FERC,* 886 F.2d 1023, 1028 (8th Cir.1989). Although this court subsequently vacated Order No. 436 in *Associated Gas Distrib's, supra,* FERC repromulgated the relevant portions of Order No. 436 in *Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol,* Order No. 500, 52 Fed.Reg. 30,334 (1987) ("Order No. 500").

Order No. 436 required Ozark to change its method of calculating charges for interruptible shippers. Under the Commission's implementing regulations ("Section 284.7"), the rates must be one part, i.e., not include demand charges or minimum bills that guarantee revenues to the pipeline. 18 C.F.R. § 284.7 (1989).

Ozark and various project-financed pipelines sought rehearing of Order No. 436, arguing that they could not meet the rate conditions of Section 284.7. Under the regulations, the pipelines would have to charge a portion of their fixed costs to interruptible shippers based on projected volume. Since those shippers might not meet the pipelines' projections, the pipelines could no longer guarantee recovery of those fixed costs (through demand charges) as required by their loan agreements. Complying with the Section 284.7 requirements, then, would place these pipelines in default on their loans.

The Commission denied Ozark's request for a general modification of the Section 284.7 rate conditions for project-financed pipelines, but chose instead to permit case-by-case waivers of those provisions. Order No. 436–A, 50 Fed.Reg. 52,217, 52,247 (1985). Shortly thereafter, Ozark filed its application for a blanket certificate, which included a request for a waiver of the Section 284.7 regulations. Because of its concern that shifting any portion of its demand charges to the interruptible shippers would place its debt instrument in jeopardy, Ozark requested permission to collect only a commodity charge from these shippers—just as it had under Section 311.

Following a technical conference on the matter, Ozark unilaterally offered a settlement: it proposed to provide interruptible service at a maximum rate of 22.5 cents per unit transported (Mcf). In addition, Columbia and Tennessee would receive a "commodity credit" for revenues collected on any unit of interruptible service that exceeded the firm shipping commodity rate (16.28 cents/Mcf). Ozark explained that any revenues it received in excess of the commodity charge were properly attributable to fixed costs. Since the firm shippers should not subsidize the interruptible shippers' rate by paying the fixed costs of that interruptible service, the proposed revenue

credit was designed to ensure that any fixed costs recovered from the interruptible shippers would redound to the firm shippers. Under this proposal, Ozark would receive the same commodity rate of 16.28 cents/Mcf from both firm and interruptible shippers.

The Commission subsequently issued an order modifying Ozark's settlement proposal, waiving its Section 284.7 regulations, and issuing a blanket certificate, contingent upon Ozark satisfying certain conditions. *Ozark Gas Transmission System,* 39 FERC ¶ 61,105 (1987). Those conditions included basing the maximum interruptible rate on a "100 percent load factor"—i.e., what Ozark would charge a firm shipper who shipped at full capacity every day (in this case, approximately 55 cents/Mcf). The Commission also required that Ozark credit its firm shippers with an amount equal to the firm shippers' demand charge (37 cents/Mcf) for each unit of projected interruptible service, irrespective of revenues collected. This effectively prevented Ozark from charging less than 37 cents/Mcf for interruptible service, unless it was willing to make up the difference out of its own pocket. *Id.* at 61,361–63.

Ozark sought rehearing, claiming *inter alia* that the conditions attached to the Commission's waiver were unreasonable. The Commission denied rehearing and vacated Ozark's blanket certificate, stating that absent imposition of the minimum crediting conditions contained in its original order, the proposed open-access transportation did not serve the public convenience and necessity. 43 FERC ¶ 61,012 (1988). The Commission reasoned that the proposed conditions were necessary to prevent Ozark from overrecovering its fixed costs or underpricing the competition by using its firm shippers' payment of fixed costs to subsidize the price that it charged interruptible shippers. This petition for review followed.

## II. REASONABLENESS OF CERTIFICATE CONDITIONS

■ The Commission's authority to attach conditions to a blanket certificate is limited by Section 7(e) of the Natural Gas Act to imposing only "reasonable terms and conditions." 15 U.S.C. § 717f(e) (1982). In evaluating the conditions that FERC imposed upon Ozark's blanket certificate, this court may only reverse if the Commission's action constitutes an abuse of discretion. *Pennsylvania Dep't of Envtl. Resources v. FERC,* 868 F.2d 592, 599 (3d Cir.1989). In making that evaluation, we conduct a "searching and careful inquiry, the keystone of which is to ensure that the [agency] engaged in reasoned decisionmaking." *International Ladies' Garment Workers' Union v. Donovan,* 722 F.2d 795, 815 (D.C.Cir.1983). Applying these standards, this court has held that a FERC-proposed revenue-crediting condition may be invalid if it produces an unreasonable result without adequate justification. *Panhandle Eastern Pipe Line Co. v. FERC,* 613 F.2d 1120, 1137–38 (D.C.Cir.1979), *cert. denied,* 449 U.S. 889, 101 S.Ct. 247, 66 L.Ed.2d 115 (1980).

■ Ozark contends that the minimum credit level and maximum rates at issue are fundamentally unreasonable—and hence that FERC abused its discretion in imposing them—because they negate and defeat the purpose of the waiver. First, it argues that compliance with these conditions will not eliminate the very problem that the waiver was intended to redress. Ozark would still be in default under its debt agreement. If Ozark complied with the conditions and credited the full demand charge per *unit* to Columbia and Tennessee, it would be reducing those firm shippers' demand charge liability without having collected funds to secure that amount— something expressly prohibited by its agreement to guarantee collection of the entire firm demand charge. Even if it drew from its own reserves to cover any shortfall in revenues, the loss of equity would place it in default.

Second, the proposed conditions have the practical effect of precluding Ozark from competing for interruptible service in the Arkoma Basin. Ozark observes that the only other pipeline servicing the area, Arkla, Inc. ("Arkla"), charges 17 cents/Mcf for

interruptible service. FERC's crediting requirement will force Ozark to charge at least 37 cents/Mcf—more than twice as much as its only competitor—simply to break even. Ozark observes that setting such a high minimum rate is inconsistent with the very purposes of Order No. 436—increasing competition and reducing prices.

FERC acknowledges that compliance with its proposed conditions would place Ozark in default. However, FERC justifies this outcome on the ground that Ozark has not exhausted all other means of avoiding default. Specifically, it recommends that Ozark attempt to renegotiate the terms of its loan agreements to permit compliance. 39 FERC at 61,360.

We conclude that requiring Ozark to seek renegotiation of its loan agreements with a third-party, commercial lender is not a reasonable condition of obtaining a waiver, especially where, as here, the agreement of many lenders would be required. It makes no sense for FERC to urge Ozark to seek restructuring of its financing, since FERC approved the financing arrangement in the first place. It is equally nonsensical for FERC to provide a waiver in order to protect Ozark from defaulting on its loans and then attach conditions which themselves would require default.

■ FERC's formulation of the minimum credit also lacks a reasonable basis. FERC maintains that mandating an uncompetitive rate for Ozark is not unreasonable in light of other policy considerations. The Commission relies principally upon the Fifth Circuit's recent statement that "Interruptible Shippers should bear the same burden of fixed costs that firm shippers bear as both classes of shippers benefit from the same service, transportation between two points." *Texaco Inc., et al. v. FERC,* 886 F.2d 749, 753 (5th Cir.1989); *see also Mobil Oil Corp., et al. v. FERC,* 886 F.2d 1023, 1030 (8th Cir.1989).

■ In granting a waiver, however, FERC conceded that policies that make sense for other utilities in other markets might not make sense for Ozark. FERC itself observed that its decision to grant a waiver was based upon an "independent review" of Ozark's circumstances. 39 FERC at 61,361. Having made the determination that it was appropriate to grant Ozark a waiver, FERC was required to determine whether the reasons underlying its "full allocation" policy still applied to a project-financed pipeline in the particular circumstances faced by Ozark. FERC cannot simultaneously determine that the interest in fostering competition requires relaxing certain restrictions upon project-financed pipelines and continue to apply policies to those pipelines which have no justification under the circumstances and which ultimately defeat competition.

FERC's attempts to justify retention of a rigid full allocation policy are without merit. It claims that applying the policy to Ozark will ensure that Ozark's firm shippers pay only for their own share of the fixed costs and that Ozark does not recover these costs twice. FERC maintains that setting the minimum credit equal to the demand charge will create a level playing field and thereby foster fair competition.

Upon examination, the minimum credit does not properly accomplish any of its purported purposes. FERC has not created a "level playing field"; it has simply imported conditions appropriate to alternatively financed pipelines in other markets and imposed them upon Ozark. If anything, the field is now slanted against Ozark, since Ozark cannot compete at the rates imposed in the certificate. FERC has not fostered competition or lowered prices but has actually granted Arkla a monopoly position. Finally, although FERC's conditions would prevent double recovery or subsidization, the Commission has used a sledgehammer to accomplish this, instead of an instrument suitable to the purpose. For example, Ozark proposed setting a lower minimum credit which would capture any revenues in excess of the commodity charge. The Commission offers no principled explanation why this arrangement would not eliminate double recovery and minimize anti-competitive subsidization in the Arkoma Basin, while still serving the purposes of Order No. 436.

The patent unreasonableness of FERC's decision is clear when one examines its effects. Under FERC's decision, an established pipeline is barred from competing in the Arkoma market because of a regulation purportedly designed to increase competition. Arkoma's consumers will pay higher rates due to the monopoly conditions. Arkoma's interruptible shippers will be deprived of an alternative method of shipping, and the presumably lower costs that it promises. Ozark's firm shippers, whom the Commission seeks to protect from receiving inadequate credit for their fixed costs, will be deprived of the opportunity to recover *any* of those fixed costs. The only benefit that FERC can discern from the conditions it has imposed is uniformity, even though the whole premise of its proceeding was that Ozark was unique and should not be treated in a uniform manner. The consequences of FERC's actions make clear that its decision does not even approach reasoned decisionmaking.

### CONCLUSION

FERC's stated purpose in promulgating Order No. 436 was to encourage competition by creating open access to all pipelines. The decisions it enters ought to pursue that end. FERC, in its wisdom, has previously approved project-financed pipelines and, in Order 436-A, expressed its belief that such pipelines also should be able to compete for open-access transportation. The approach FERC takes to project-financed pipelines ought to make such competition possible. Although FERC may certainly attach conditions to Ozark's blanket certification in order to prevent subsidization or double recovery, those conditions must be reasonably tailored so as to accomplish the Commission's stated objective of promoting fair competition. (Such actions would, of course, also need to conform to the requirements of our decision in *Northern Natural Gas Co. v. FERC*, 827 F.2d 779 (D.C.Cir.1987) (en banc)). FERC has failed to demonstrate why full allocation is necessary under the circumstances or to identify any benefit flowing from rigidly adhering to that condition. The only result of FERC's purported procompetitive efforts in this case has been to *eliminate* competition for interruptible shipping in the Arkoma Basin.

We remand for FERC to formulate a reasoned proposal that is consistent with its objective of permitting fair competition by Ozark. The petition for review is granted.

*So Ordered.*